[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
On 4/27/95, exactly one year after Peter and Michael M., brothers then aged nearly two years and not yet one year old respectively, were committed to the custody and guardianship of the Department of Children and Families (DCF) as neglected and uncared-for under Sec. 46b-129 of the Conn. Gen. Stats. (Rev. 1993), they became the subjects of these petitions by which DCF seeks to terminate the parental rights of Ann K. and Peter M. (Sr.), their mother and acknowledged father. The petitions allege three of the four nonconsensual grounds for such termination as found in Sec. 17a-112, applicable to children such as these who were previously committed to the state:
1 — Failure to rehabilitate;
 2 — Denial of necessary care by reason of parental acts of commission or omission;
 3 — The absence of a parent-child relationship and the detriment to the children of permitting further time for such relationship to be established or reestablished.
Service was confirmed at the initial hearing held on 5/25/95 and a separate attorney was appointed by the court to represent the father. Two months later, DCF's motion for an updated evaluation by the same clinical psychologist who had seen the family in January of 1994 was granted. In a hearing on 9/13/95, at which the original 18 month commitment was extended CT Page 1365-DDDD without prejudice, the court suo moto appointed separate guardians ad litem to represent the best interests of each parent. After receipt of the updated evaluations, a trial date was set. On January 18, 1996, in a hearing attended by both parents, their two attorneys and their two guardians ad litem, the trial was concluded. All parties waived their right to submit trial memoranda, and the court reserved its decision.
The adjudicatory date, in the absence of any amendment having been filed to the original petition, is 4/27/95; the dispositional date is 1/18/96 which is also the date on which decision was reserved.
Facts
Evidence offered at trial, interpreted in the light of the prior record in this court concerning these children, of which judicial notice is taken, supports the following findings of fact:
Although Ann K. and Peter M. (Sr.) never married, they had lived together, first with Ann's mother and later with her grandmother, for approximately two years before Peter Jr. was born on 5/19/92. For his first few months of life, Peter Jr.'s care was shared with his maternal great grandmother, but soon after his parents moved, in early 1993, into a house belonging to his recently deceased paternal grandmother, DCF began to receive referrals on the questionable care being provided to the child. Diane Ferraro, case manager for Ann from the Department of Mental Retardation (DMR) testified to the services that were offered to these parents in their attempt to care for little Peter in their own home: The Center for Independent Living, under contract to DMR, provided a counsellor to visit their home 20 hours a week; Ms Ferraro visited personally an additional once or twice a week for 11 months; a Birth-to-Three teacher came to the house to work with Peter twice a week; Family Preservation, for some portion of this period, came an additional 20 hours a week. Although the parents appeared to be receptive to instructions on standards of hygiene and safety, none of the instructions were observed to be put into practice without constant reminders from the instructors. While Peter Sr., unlike the mother, had not been designated as mentally retarded and therefore eligible for DMR services in his own right, Ms Ferraro observed that he, too, failed to recognize the special needs of his child (e.g. to support a floppy head, to CT Page 1365-EEEE avoid abrupt movements while holding the baby, to cut food up into small pieces to avoid choking, to realize that children this young and this limited could not "learn", by choking or falling, not to expose themselves to danger).
Michael was born 9/4/93, at the same time the family was being evicted from the house in which they were then living. Due to being temporarily homeless, the parents gave DCF permission to place both boys on 9/7/93. Since the boys remained in placement for more than 90 days, DCF, pursuant to its policy on voluntary placement, filed petitions alleging the children to have been neglected and/or uncared-for. On 4/17/94, although the parents had by that time secured an apartment, they did not seek return of their children nor did they appear to contest the commitment of their sons. They did appear in court, with their attorney, a month later and agreed to the expectations articulated by the court as a guide to the reunification of their family. These included keeping their whereabouts known to the DCF social worker and to their attorney, visiting as often as DCF permitted, participating in biweekly counselling to gain understanding of their children's disabilities and limitations, and the securing of adequate housing. Both parents and their attorney signed the list of these expectations which form part of the record of hearing of 5/18/94.
The parents visited regularly, at first in the foster homes where the boys were living. (Peter has had three foster home placements and Michael a single placement in the more than two years preceding the trial date.) After a few months, the boys were transported by the DCF social work to the parents' own apartment where the social worker attempted to help them understand and be able to meet the needs of these boys, both of whom are significantly developmentally delayed. Neither parent appeared to understand the importance of securing a safe environment for these limited young children, and had to be constantly reminded to follow them around during home visits and to be sensitive to the physical hazards in their home. (Testimony of social worker Mary Corcoran.) The parents were offered transportation and the opportunity to accompany Peter to the Special Needs Center where he was receiving therapy, but each parent attended on only a single occasion. The social worker offered to take them there whenever they requested, but neither made such request either before or after the couple separated in the spring of 1995. CT Page 1365-FFFF
Soon after their separation, Peter Sr. entered a relationship with another woman and moved into a one-bedroom apartment which he has never offered as a possible home for these children. Ann has rented a series of rooms in the homes of others from the time of their separation to the time of trial. None of these living accommodations has ever been suggested as a place where she could make a home for these children.
Both boys have special developmental needs that would present a challenge to the most experienced and attentive parents: Peter, at three and one-half, is not toilet trained, has almost no intelligible speech, has both gross and fine motor delays that impede self-care. (Testimony of Patricia Ahearn.) Michael was identified at 7 months of age as being eligible for Birth-to-Three in-home services because of his developmental delays which were tested at two deviations from normal. The Service Coordinator for this program termed it "critically important" for such a child's daily caretakers to be able to provide a highly structured, responsive and patient environment. (Testimony of Linda Day.)
Dr. Hedy Augenbraun, the court-appointed clinical psychologist who had evaluated this family in January of 1994 (State's Exhibits A through E) and again in August of 1995 (State's Exh. F) detected no improvement in the functioning of either parent in the 19 months between evaluations. In fact, the increase in the mother's depression had caused a lowering of her I.Q. scores. While both parents, in the 1995 evaluation, acknowledged that their children were "slow" and needed special services, they both minimized the extent of the children's deficits and the likelihood that they would continue to need special services indefinitely. While this would be hard for any parent to acknowledge, it was impossible for these parents who themselves are both limited in understanding of the children's needs, ability to meet those needs in ways to secure their safety, and facility for reaching out for, and accepting, the helping resources available to their children. While only Peter Sr. had ever been hospitalized psychiatrically in the past, Dr. Augenbraun found that both parents displayed schizoid personality traits: Both were seen as impassive, withdrawn, mistrustful, likely to misinterpret the behavior of others because of insensitivity to normal socialization. (Testimony of Dr. Augenbraun.) In the opinion of the only expert witness to CT Page 1365-GGGG testify in this proceeding, neither parent would ever be able to provide adequately for these two children since "they need supervision themselves to function adequately". While both parents interacted appropriately with the children who were not disturbed by contact with them but rather seemed to regard them as familiar presences, it would be "deleterious", to both boys, in Dr. Augenbraun's opinion, to wait longer than the more than two years they have already been in foster homes for an outcome — their parents becoming capable of recognizing and meeting their special needs — that is predicted to be impossible to attain. "Permanent placement of the children in stable families able to provide for their special needs is highly desirable." (State's Exh. F, last page.)
Adjudication — on facts as of 4/27/95
Two of the three grounds pleaded for the relief sought must be dismissed at the outset. The petitioner offered no evidence that in the year preceding the institution of this action either child had been denied any "care, guidance or control necessary for his physical, educational, moral or emotional well-being" by anyone, much less by these parents who have not had custody or guardianship during this period. Indeed, if there had been such denial, it would have been the responsibility of DCF, not of these noncustodial parents. Further, while a literal reading of the last ground pleaded — the absence of parent-child relationship, as defined in Sec. 17a-112(b)(4) and the detrimental effect of permitting further time to establish or reestablish such relationship — would seem to be supported by the evidence in this record, given the interpretation of this ground imposed by appellate case law in In Re Jessica M., 217 Conn. 459
(1991) and In Re Kelly S., 29 Conn. App. 600 (1992), it, too, must be dismissed. The children regard their parents as familiar people, not as strangers, and have no negative response to continuing contact with them. Under these circumstances, this record lacks clear and convincing evidence that this ground exists.
The petitioner has, however, provided more than clear and convincing evidence that in the more than 18 months between the boys' placement in foster care in September of 1993 and the adjudicatory date in April of 1995, neither parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible CT Page 1365-HHHH position in the life of the child." The parents did fulfill many of the expectations articulated by the court in May of 1995: They did visit regularly; they did attend some parenting sessions; they did avoid drug use and involvement in the criminal justice system. But the real test of the existence of this ground is the answer to the question: On the adjudicatory date, are the parents at or nearing the point at which they could safely resume care of these children? The answer here is clearly "no". In fact, in this case, on the adjudicatory date the parents appear to be further from that point than they were on the date of commitment. On that date (4/27/94) they were in their fourth year of their relationship, they had found an apartment in Bridgeport, they were visiting regularly and attending parenting classes. A year later, they had separated. The mother was living in in a series of rooms rented from others, appeared more depressed, and was testing cognitively lower than she had when the children were placed. Neither parent has ever offered any concrete plan for the care of the children or represented that they even had adequate housing for either one of them. Their limited cognitive abilities and clinical conditions, while clearly not the result of any lack of effort or motivation on their part, keep them now, and will keep them for the indefinite future, from being able to provide the unusual degree of skilled and sensitive parenting that children with the severe limitations that these children display will need. According to the only expert clinical witness, this is not likely to improve in the future.
Grounds exist, therefore, to terminate the parents' rights.
Disposition — on facts as of 1/18/96
In the nine months between the adjudicatory and dispositional dates, there has been no change suggestive of sufficient improvement in the ability of either parent to care adequately for these children to support a finding that they should wait longer than the two-plus years they have already been waiting in foster care for a safe and permanent home. Ann K. continues to live in the homes of others and to need and utilize the services of DMR for her own survival. Peter Sr. appears to have entered another relationship with a woman and to have secured an apartment which is too small to permit him to consider requesting return of his sons. Neither offered any evidence of improved functioning from the levels that obtained at the time the children were placed. The fact that such CT Page 1365-IIII improvement may be beyond the capacity of either parent to achieve cannot be used to defeat the conclusion for which the evidence is overwhelming in this case: That it is clearly in the best interests of these children to end their foster-child status and to permit them to be placed, hopefully in the same home, in the secure permanency of adoption. The only testimony in this record supports a finding that such an adoptive placement is a realistic probability for these children and that any further delay in implementing it can only be detrimental to their best interests.
Before termination may be ordered, however, the court must consider the seven factors set forth in subsection (d) of Sec.17a-112:
1) Timely and appropriate services were offered and provided both by DCF and DMR before and after these children were committed as neglected/uncared-for to DCF. Dozens of hours of instruction in their own home failed to internalize within either parent the recognition of the necessity for providing a safe, stimulating and appropriate environment for these special needs children.
2) The efforts made by the state to reunite this family were reasonable under the circumstances: Visitation was never denied and, in fact, facilitated. Instruction in parenting was offered. Participation in the special education being offered to the older child was made available to both parents.
3) No orders were entered in this case, other than to attend court sessions and appointments with the clinical evaluator, with which both parents complied. The expectations of the court, while not orders, were only partially fulfilled: The parents did visit and did keep DCF informed of their whereabouts for most of the period covered. They did not, however, secure adequate housing or attend sufficient sessions of services offered to familiarize themselves with the children's needs to effect any discernible improvement in their ability to recognize and meet those needs.
4) It is hard to ascertain the feelings and emotional ties of children this young who have little or no affective speech. Each boy appears to enjoy visits with parents and a good relationship with the foster parent. CT Page 1365-JJJJ
5) On the dispositional date, Peter Jr. is four months short of his fourth birthday; Michael is four months past his second birthday. Both boys have been in foster care more than two years. They are at critical stages of their already fragile development. Dr. Augenbraun was unequivocal in recommending placement in permanent adequate homes without further delay.
6) The parents have made little effort to adjust their circumstances to permit return of these children in the foreseeable future, other than to visit as often as permitted. Neither has achieved a home adequate for these children; neither shows a significant increase of understanding of their children's special needs. Both need help in their own functioning and offered no evidence to suggest that they, or either of them, were any more capable of meeting the needs of these boys in 1996 than they were in 1993.
7) Nothing has prevented these parents from maintaining a meaningful relationship with these children. Such relationship is impeded by the inherent limitations in the capacity and functioning of each parent and of each child. This is a tragedy the fault for which cannot be ascribed to any of the persons involved, but the absence of fault cannot be a reason to deny these children the opportunity to maximize whatever potential they may have by being assured permanency in an appropriate nurturing adoptive home without further delay.
Judgment
Having duly considered the record at trial and the mandatory considerations, it is found by clear and convincing evidence to be in the best interests of both boys for the parental rights of both parents to be terminated so that they may be placed, after more than two years in the impermanency of state foster care, into the security of permanent adoption.
Therefore, it is Ordered that the parental rights of Ann K. and Peter M. Sr. in and to their sons Peter M. Jr. and Michael M. be TERMINATED and that the Commissioner of Children and Families be appointed statutory parent for the purpose of placing these children in a permanent home or homes as soon as possible. To secure this end, and in conformity with subsection (i) of Sec. 17a-112, it is further Ordered that the said Commissioner shall report to this court in writing no later than 90 days after the date of this judgment as to the progress in CT Page 1365-KKKK implementing this plan. If adoption of either child has not been finalized within twelve months from the date of this judgment, the said Commissioner is further Ordered to submit a Motion for Review of Plan for a Terminated Child to be heard no later than fifteen months after the date of this judgment. The appointment of counsel and guardian ad litem for the children shall be deemed to continue until DCF is no longer their legal guardian.
Entered at Bridgeport this 2nd day of February, 1996.
FREDERICA S. BRENNEMAN, JUDGE